UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Meapeh Kpou and Nyaquoi Nyayolo,

       Plaintiffs,

v.                                   Case No. 19-cv-1032 (JNE/HB)
                                       ORDER

Supervalu, Inc.,

       Defendant.

Plaintiffs Meapeh Kpou and Nyaquoi Nyayolo are Black, immigrant employees at Defendant Supervalu, Inc.'s ("Supervalu") distribution center in Hopkins, Minnesota. Plaintiffs allege discrimination and retaliation on account of their race and national origin in violation of 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, and the Minnesota Human Rights Act ("MHRA"). Plaintiffs base their claims on Supervalu's hostile work environment, perpetuated by Plaintiffs' coworkers. Plaintiffs also allege that Supervalu negligently retained and supervised several of their coworkers in violation of Minnesota common law.

This matter is before the Court on Supervalu's Motion for Summary Judgment. ECF No. 69. Plaintiffs oppose the motion.[1] For the reasons stated below, Supervalu's motion is granted in part and denied in part.

---

[1] Plaintiffs do not contest the dismissal of Nyayolo's retaliation claim under Title VII in Count 4, Kpou's discrimination claim under the MHRA in Count 5, Kpou's retaliation claim under the MHRA in Count 6, or Nyayolo's retaliation claim under the MHRA in Count 6.

## BACKGROUND

The Court views the record in favor of Plaintiffs, the nonmoving parties.

### I. General Background

### a. The Hopkins Distribution Center

Kpou and Nyayolo both work at Supervalu's distribution center in Hopkins, Minnesota. The distribution center consists of four buildings that span about a mile end to end. The general manager and the director of warehouse operations oversee the distribution center. Each of the four buildings has a warehouse operations manager responsible for the activities and employees in that building. Each shift has a superintendent responsible for the activities and employees on that shift. There are also dozens of warehouse supervisors. Four people make up the human resources ("HR") team.

The workforce at the distribution center consists of roughly 950 employees. Employees are separated into three shifts. Roughly 300 employees and twenty-five supervisors are on site at a given time.

### b. The Union

About 800 of the 950 employees belong to a union. A collective bargaining agreement ("CBA") governs the relationship between Supervalu and its union employees.[2] Under the CBA, senior employees can "bump" less senior employees from their specific work assignment.

---

[2] The CBA is between Supervalu and Teamsters Local 120. The vast majority of Supervalu's union employees, including Kpou, Nyayolo, and the other employees at issue

The CBA also governs employee discipline. Supervalu can discipline union employees only upon just cause as specified by the CBA. When disciplining employees, Supervalu cannot consider warning notices issued over eleven months earlier. After being disciplined, employees may appeal Supervalu's decision through a four-step grievance process culminating in arbitration. The union represents employees during this process.

### c. Supervalu's Policies, Trainings, and Procedures

#### i. Policies

Supervalu has several policies prohibiting discrimination and harassment and promoting Courtesy, Dignity, and Respect ("CDR"). The Equal Employment Opportunity Harassment and Discrimination Policy prohibits discrimination and harassment. The Workplace Rules and Regulations, which are negotiated as part of the CBA, prohibit use of racially derogatory gestures or statements while on the premises and make such use a possibly terminable offense. The Threats and Violence Free Workplace policy aims to ensure a safe work environment. Finally, Supervalu's Code of Conduct reinforces these policies.

#### ii. Trainings

During employee orientation, trainers highlight and explain Supervalu's various policies, though the union is responsible for informing employees of the Workplace Rules and Regulations. Trainers spend about five minutes covering the anti-discrimination policies. New employees also watch a CDR video, which emphasizes

---

here, belong to Teamsters Local 120. Where the Court discusses union activity, it is referring to Teamsters Local 120.

Supervalu's harassment and discrimination policies. An onsite kiosk allows employees to access the policies at any time after their orientation.

As to post-orientation training, there is evidence that management receives at least some sort of refresher training. For example, the record contains a PowerPoint from July 2016 entitled "Investigation Protocol." The PowerPoint provides a high-level view of investigation responsibilities and includes further details on issues like internal theft over $100,000 or wrongdoing by senior leaders. HR personnel also attend monthly calls with Supervalu's legal team.

In early 2016, Supervalu's supervisors and managers received training on recognizing and reporting discrimination and harassment complaints. There was also a "Respectful Workplace" training for employees in mid-2016, which is discussed further below. Supervalu attempted to have some sort of training in 2020 as well but was unable to complete the training due to the COVID-19 pandemic.

### iii.  Investigation Procedures

Supervalu allows employees to report policy violations, including incidents of retaliation, by contacting a supervisor, reporting their complaints to HR, or calling an associate hotline. Still, many complaints go unreported for fear of retaliation. A 2016 cultural survey indicated that Supervalu should work to ensure employees could report incidents without fear of retaliation.

Supervalu generally investigates policy violations by interviewing the parties involved, questioning witnesses, and reviewing any available surveillance video footage. Supervalu paints the process as flexible and situation based. Plaintiffs assert the process

is inconsistent. The 2016 cultural survey indicated that Supervalu should work to ensure the company responded quickly and consistently to misconduct.

At the time of the incidents at issue here, Supervalu had no collection of complaints and no documented procedure for conducting investigations. Though management was frequently tasked with taking statements and interviewing witnesses, managers received no formal training on investigations or interviews. The HR manager at the time, Sue Sturnieks, eventually put together an Investigation Checklist, but it is unclear when this occurred and what it entailed.

### d. Kpou and Nyayolo

Kpou has been an employee at the distribution center since 2002, Nyayolo since 2015. Both Kpou and Nyayolo still work at the distribution center. Their work generally includes loading and receiving, though their specific assignments depend on the work available and their comparative seniority that day.

Kpou and Nyayolo are both of West African descent. Kpou was born in Liberia and came to the United States in 1993. Nyayolo was also born in Liberia and came to the United States in 1999. Though Kpou and Nyayolo are bringing the instant action together, their core allegations are distinct.

## II.   Facts Related to Kpou's Complaint

Plaintiffs list seventeen discrete incidents that Kpou encountered as a Supervalu employee, in addition to general, ongoing harassment. The Court discusses the incidents in the order Plaintiffs list them, though the timing of specific incidents is at points unclear.

On September 22, 2015, an argument broke out between a group of white employees and a group of Black, immigrant employees in the distribution center's breakroom. The group of white employees believed the Black employees were being too loud. White employee Jason Bialucha went over and told the Black employees to quiet down. A heated discussion ensued, culminating in white employee Larry Schmitz throwing a glass hot sauce bottle at the group of Black employees. The bottle barely missed the Black employees, hit the wall behind them, and shattered. Schmitz threw the bottle because "'something had to be done to stand up' for his rights." Def.'s Ex. O, ECF No. 72-2 at 35.[3] According to Supervalu, Schmitz threw the bottle "to instigate or provoke violence between two distinct ethnic groups that were arguing." *Id.* at 36. No one immediately reported Schmitz's actions.

As the employees returned to work, Bialucha spoke with Kpou, who had not been in the breakroom **(Incident 1- "Bialucha's post-breakroom comments")**. According to Kpou, "Bialucha was mad at [him] and told [him] that '[his] Africans' needed to stop and that [he] needed to 'get them under control,' or words to that effect." Kpou Decl. ¶ 3(c), ECF No. 86. After Kpou tried to explain he had not been in the breakroom, Bialucha said "it's not f*****g right," and told Kpou "you guys" need to stop. Pls.' Ex. 4, ECF No. 79-3 at 3; Kpou Decl. ¶ 3(d), ECF No. 86.[4] According to Bialucha, Kpou told him that the

---

[3]     As not every exhibit is individually paginated, the Court will often cite the ECF assigned page numbers.

[4]     Supervalu complains in its reply that Kpou's declaration concerning what Bialucha said contradicts Kpou's contemporaneous statement and deposition testimony. There are two problems with Supevalu's argument. First, Kpou relies not only on his declaration, but also on a copy of the September 25, 2015, police report. Second, Kpou's

Black employees had a right to be loud and Bialucha should take his break outside if he did not like it.

Bialucha and Schmitz, who was present or nearby for Bialucha's conversation with Kpou, continued to speak angrily about their rights. The three men then went to work on the warehouse floor. Kpou was on a pallet jack that weighed about 4,000 pounds. Schmitz was on a large, forklift-like machine that weighed about 9,000 pounds. Soon after the men began working, Schmitz drove his machine into Kpou's machine while yelling "I have rights too" **(Incident 2- "Schmitz forklift incident")**. Def.'s Ex. L, ECF No. 72-2 at 19. Schmitz hit and dragged Kpou's machine, slamming Kpou into a rack while he continued to yell about his rights.

Kpou reported the incident to a supervisor and Supervalu began investigating. Kpou requested that Black employee Jerry Walker act as his union representative during the investigation. That day, Kpou submitted a statement and Supervalu interviewed Schmitz. After interviewing Schmitz, Supervalu escorted him out of the distribution center and suspended him. Supervalu then questioned other possible witnesses.

Eight days later, Supervalu terminated Schmitz. Schmitz filed a grievance against his termination, which Supervalu defended. The grievance culminated in arbitration, where the termination was upheld. Schmitz committed suicide roughly a year later.

---

declaration supplements his investigation statement and deposition testimony; it does not contradict them. The handwritten statement Supervalu asked Kpou to write the day of the incident cannot be expected to contain every detail. Nor can Supervalu fault Kpou for its own failure to ask whether Bialucha made any additional comments.

White employees at the distribution center openly shamed Kpou for reporting Schmitz. The hostilities increased after Schmitz's suicide.

On September 24, 2015, two days after the Schmitz forklift incident, Kpou found a note in his locker **(Incident 3- "first note")**. The note said, "DIE N****R," and contained a drawing of some sort of symbol. Plaintiffs contend that the drawing shows a person who has been run over. Kpou reported the note to his supervisor, who took the note to a warehouse manager. The warehouse manager interviewed Kpou about the note with Walker present. Kpou also provided a written statement. There was a quick, nonchalant meeting between Kpou, Walker, and a few union-associated managers. At that meeting, Walker stated that the note was an insult to every African American.[5]

The warehouse manager offered for Kpou to take the rest of the day off with pay. Sturnieks also asked if someone could follow up with Kpou and make sure he understood his resources under the Employee Assistance Program. Kpou testified however, that while he was aware of the Employee Assistance Program no one specifically reached out to him about it.

Supervalu also encouraged Kpou to call the police. Though both parties assert that Kpou subsequently called the police, the police report states that Supervalu manager John

---

[5]     Supervalu asserts that a manager explained to all of the hourly employees on shift that a note had been found that violated company policy. The record reveals that at the "nonchalant" meeting, Walker asked if two union managers would speak to the crew and also asked if he could speak to the crew. Def.'s Ex. P, ECF No. 72-2 at 45. Kpou's deposition testimony on the matter is unclear. *See* Def.'s Ex. UU, Kpou's Dep. 167:3-169:12, ECF No. 72-3. While a jury could infer that someone ultimately spoke to the crew, the Court cannot make this inference at the summary judgment stage.

T. Bushland was the reporting party. Confusingly, Bushland wrongly told police there were no video cameras inside the distribution center.

Supervalu investigated the note itself as well. Supervalu interviewed numerous witnesses, hired a handwriting expert, cross-referenced attendance records, and attempted to identify the symbol drawn on the note. Originally, Kpou did not want to speculate who had left the note, but later told Supervalu that there were rumors that three people had left it: Bialucha, Hazen, or another white employee and friend of Schmitz, Karl Nyman.

Bialucha, Hazen, and Nyman spread rumors that Kpou had written the note himself **(Incident 4- "note rumors")**. Hazen and Nyman told the police that Kpou had written the note "so he would not be being terminated" because management would be "careful around Kpou due to the racial nature of the note." Pls.' Ex. 4, ECF No. 79-3 at 6-7; *see also* Walker Decl. ¶ 11, ECF No. 84.[6]

After considering who was working at the time, where the note was found, and the handwriting on the note, Hazen became Supervalu's primary suspect. Supervalu further

---

[6]      Paragraph 11 of Walker's Declaration states, "Mr. Bialucha and other white employees told me that they believed Mr. Kpou had written the letter and placed it in his own locker." ECF No. 84. Supervalu argues that this is inadmissible hearsay. The Court disagrees. Walker's statement is not being offered to prove the truth of the matter asserted, that the white employees believed Kpou had written the note, but to prove that they were telling other employees that. *See* Fed. R. Evid. 801(c)(2) (defining hearsay as a statement offered "to prove the truth of the matter asserted in the statement").
      In its reply to Plaintiffs' response, Supervalu argues in a footnote, "All of Plaintiffs' declarations contain inadmissible hearsay, including Kpou's (¶¶ 3d, 7, and 8), Walker's (¶¶ 7-8, 10, 11, and 18-20), and Jernemu Kpou's (¶¶ 3 and 6). The Court should not consider these inadmissible hearsay statements." Def.'s Reply 4 n.1, ECF No. 88. Many of the paragraphs Supervalu cites contain multiple statements. Supervalu does not identify the specific statements it believes to be hearsay. Nor does it provide any explanation or support for its argument. The Court rejects Supervalu's argument.

suspected Hazen because he, along with two other employees, had been suspended in 2013 for writing threatening graffiti about a female supervisor. However, Hazen was ultimately found not culpable of the threatening graffiti and was given back pay for the period he had been suspended.

At some point after the first note, white employee Shawn Dykhoff knocked Kpou's pallet over with a forklift **(Incident 5- "Dykhoff incident")**. Dykhoff asked Kpou why he got Schmitz fired. Kpou testified that Dykhoff was defending Schmitz because of his race. Kpou reported the incident but does not know whether it was investigated or not.

White employee Lukas Ecker also taunted and harassed Kpou for reporting Schmitz **(Incident 6- "Ecker incident")**.

On October 18, 2015, Bialucha swerved his equipment into Kpou's lane and accused Kpou of costing Schmitz his job **(Incident 7- "Bialucha swerving incident")**. Kpou informed a supervisor of the incident. The supervisor told Bialucha to "make sure he is working safe." Def.'s Ex. BB, ECF No. 72-3 at 5. Sturnieks followed up with Kpou and took his statement. The next day Sturnieks talked to Bialucha, who gave a different version of the events.

Kpou later reported finding Sturnieks unhelpful because she did not take him seriously. Sturnieks told Kpou that she could not stop his coworkers "from doing anything or from saying whatever they want to say to [him]." Def.'s Ex. UU, Kpou Dep. 201:12-202:15, ECF No. 72-3.

At some point after the Schmitz forklift incident, Bialucha told Kpou that he deserved to be hit by Schmitz **(Incident 8- "Bialucha forklift comment")**.

On October 23, 2015, Walker found a note in his locker **(Incident 9 –"second note")**. The note said, "YOU LIE YOU DIE N****R," and contained a picture of guns, the number 2, and the symbol that had been drawn on the first note. Walker showed the note to nearby coworkers, who told him to throw it away. Soon after, Hazen taunted Walker with a note he purportedly found in his own locker. Hazen's note looked like the notes Walker and Kpou had found. Walker believed that Hazen wrote all three notes and informed Supervalu of his suspicions. When Kpou heard about the second note, he left for the day out of fear for his safety.

Supervalu initiated an investigation similar to the one connected to the first note. Supervalu also hired an external investigator, Jessica Pecoraro, to look into both notes. Pecoraro began interviewing witnesses on December 1, 2015. During her investigation, Pecoraro interviewed sixteen witnesses. Pecoraro also reviewed various documents.

According to Supervalu, Pecoraro was unable to determine the author of the notes.[7] Hazen was again a suspect, in part because he had since been suspended for making profane racial statements towards Kpou, discussed further below. Hazen was also a suspect because he twice lied during Pecoraro's investigation. First, Hazen said he did not know where certain employees' lockers were. Hazen's answer to a later question

---

[7]     Supervalu repeatedly cites Defendant's Exhibit T, ECF No. 72-2, without providing pin cites. Exhibit T is titled "Investigation Summary" and spans fifty-one pages. The Court was unable to locate Pecoraro's conclusions within Exhibit T.

showed that he did know. Second, Hazen said he did not have a conflict with Kpou, but later admitted that he was suspended for making profane statements towards Kpou. In May 2016, Supervalu issued Hazen a written warning for lying during the investigation. Supervalu also required Hazen to attend a one-on-one training session to discuss his understanding of Supervalu's CDR policy.

On October 26, 2015, employee Rick Dennie asked Sturnieks why Supervalu had not made a statement condemning the threatening notes.[8] Neither party identifies Dennie's race, but Dennie told Sturnieks that the notes were a threat to all Black employees. Sturnieks replied that the notes were not directed at a group. In an email that day, Sturnieks relayed her conversation with Dennie and wrote, "He's another one......ugh." Pls.' Ex. 6, ECF No. 81 at 2.

Sturnieks could not recall whether anyone in HR or management did anything to prevent similar notes or deescalate the tension.

Kpou felt that the issues were swept under the rug and that the investigation lacked transparency. Kpou was anxious. He constantly worried about his safety. Though Supervalu obtained onsite security guards and asked managers to discreetly keep an eye on things, Kpou testified the security increase lasted only a week.

On November 30, 2015, Hazen made profane racial statements towards Kpou **(Incident 10- "Hazen race comments")**. Kpou reported the incident. Supervalu

---

[8]     The record is unclear as to the spelling of Rick Dennie's last name. For instance, one email chain uses both "Denny" and "Dennie." Def.'s Ex. HH, ECF No. 72-3 at 57, 59. For purposes of this order, the Court uses "Dennie."

suspended Hazen for the rest of the day and issued him a CDR letter. Hazen filed a grievance and was ultimately given back pay for the period he had been suspended, but the CDR letter remained in his file. Hazen does not remember discussing Supervalu's discrimination policies with anyone after the incident.

On December 31, 2015, Kpou sat down with Sturnieks. Kpou told her that he faced daily comments and threats from coworkers and that they often told him he needed to watch his back for getting Schmitz fired. Kpou took the threats seriously because many employees carried weapons at work and in their cars. Kpou explained that he had stopped bringing his lunch to work for fear that someone would "spike it." Def.'s Ex. CC, ECF No. 72-3 at 12. He also frequently came to work early and stayed late because of the need to watch his back in the parking lot. Kpou felt ostracized and did not know "who was capable of what." *Id.* at 13. Kpou specified that insults from Greg Turner were an "everyday thing." *Id.* at 12.

On January 7, 2016, Kpou went to HR again. Employee Sam Ross accompanied him. Ross told Sturnieks that when Kpou was changing the printing paper, Turner came up and argued with him **(Incident 11- "Turner threats")**. Turner later told Ross, "You need to warn your boy – there's a red flag on him – he's already got two people fired – he'd better watch himself." Def.'s Ex. DD, ECF No. 72-3 at 16 (formatting in original). Kpou told Sturnieks that he was facing a hostile work environment as well as threats on his life and job in retaliation for Schmitz's termination.

After both the December 31 and the January 7 conversations, Supervalu offered to have someone escort Kpou to and from his car. Supervalu also offered for Kpou to store

and eat his lunch in a manager's office. Kpou declined the offers. At her deposition, Sturnieks could not recall whether Turner, or anyone else who retaliated against Kpou, was disciplined.

Sometime in late January or early February 2016, Kpou spoke with HR a third time. Kpou again reported an unsafe work environment and retaliation. Sturnieks testified that she understood Kpou felt that Supervalu was not supporting him.

Sturnieks sent a letter to Kpou dated February 3, 2016, following up on Kpou's third conversation with HR. Sturnieks wrote, "I am concerned about your statement that you have concerns regarding retaliation and the work environment that you are not sharing with SUPERVALU." Def.'s Ex. Z, ECF No. 72-2 at 147. Sturnieks urged Kpou to share any documentation he had with Supervalu. She also reiterated Supervalu's offers to arrange escorts to and from Kpou's car and to provide secure storage for Kpou's lunch.

Sometime in mid-2016, Supervalu held a Respectful Workplace training for its employees. The training covered Supervalu's anti-discrimination and violence prevention policies. Employees signed an acknowledgement sheet and a copy of the Equal Employment Opportunity policy at the training. Though Hazen attended the Respectful Workplace training, at his deposition Hazen could not recall any anti-discrimination training and remembered a training concerning only Supervalu's policies on violence and threats of violence. According to Hazen, the training included information on what to do in the event of an active shooter. Hazen testified that few employees took the training seriously. Some were asleep; someone made gun sounds on their phone.

14

On December 10, 2016, white employee Rex Walters threatened to punch Kpou in the face **(Incident 12- "Walters threat")**. It was well known at the time that Walters did not like "people of [Kpou's] color" and "would use the 'N' word without any hesitation." Def.'s Ex. UU, Kpou Dep. 87:14-88:5, ECF No. 72-3. Following Sturnieks' instructions, Kpou reported the incident to a supervisor. Sturnieks had instructed Kpou to report incidents to management, instead of HR, because Kpou was harassed whenever he went into the HR office to file a complaint. The supervisor subsequently took a statement from Kpou and tried to take one from Walters, though Walters refused.

Kpou understood that Sturnieks became aware of the incident shortly after it occurred, but Sturnieks testified that she first found out about Walters' threat in late 2017 when Kpou was suspended for threatening to punch Dennie in the face, a separate incident discussed below. After Kpou's suspension, Kpou asked Sturnieks why Walters had not been suspended for similar conduct in 2016. Sturnieks looked into the Walters threat and found that the supervisor Kpou had reported it to had never forwarded the information to HR. Sturnieks asked the supervisor involved to write up what he remembered about the incident and to talk with the witness that Kpou had identified. The witness stated that he wanted to stay out of other people's business, he could not remember the incident, and he could not hear anything at the time.

On October 3, 2017, Dennie was aggressive and taunting towards Kpou **(Incident 13- "Dennie incident")**. Kpou asked Dennie to stay twenty feet away from him. Dennie then accused Kpou of threatening to punch him in the face. Supervalu investigated and suspended Kpou. Kpou filed a grievance against his suspension. Though Supervalu had

15

originally used edited portions of surveillance video footage to make it seem like Kpou was the aggressor, a full review of the video footage revealed that Kpou was the victim. Supervalu then attempted to make Kpou sign a "last chance" agreement that would allow it to fire Kpou for any further misconduct. Kpou refused to sign the agreement but was allowed back to work and given back pay for the period he had been suspended as he had been found innocent during the grievance process.

Kpou also experienced harassment at the hands of white employee Jason Anderson. Anderson had taunted Kpou ever since the Schmitz forklift incident, though the harassment increased in the following years. In 2019, Kpou had four distinct encounters with Anderson. First, Anderson tried to hit Kpou with his forklift **(Incident 14- "Anderson forklift incident")**. Kpou did not report this incident because it was not in view of a camera. Kpou did report the three following incidents.

On February 6, 2019, Kpou reported that Anderson had physically bumped into him **(Incident 15- "Anderson bump incident")**. Supervalu interviewed both Kpou and Anderson. Kpou stated that the incident was racially motivated and explained again that he experienced constant harassment from coworkers. Kpou also expressed concern about reporting instances of discrimination given Supervalu rarely responded. Anderson stated that the incident had been an accident. Ultimately, HR sent Anderson a reminder of the CDR policy. Cassie Littman, a member of the HR team at the time and the current HR manager, stated that there was nothing to substantiate that the bump was not an accident. Kpou testified that the surveillance footage showed Anderson had intentionally bumped him.

On October 2, 2019, Kpou and Anderson each alleged that the other blocked the aisle **(Incident 16- "Anderson aisle blocking incident")**. Supervalu interviewed Kpou and Anderson, questioned witnesses, and reviewed surveillance video footage. Supervalu determined that Kpou and Anderson were both at fault and issued them both CDR reminders.

On October 17, 2019, Kpou reported that Anderson stepped on his foot, pushed him backwards, and told him, "This is America, we pass on the right" **(Incident 17- "Anderson shoving incident")**. Def.'s Ex. OO, ECF No. 72-3 at 119. In response, Supervalu interviewed Kpou, Anderson, and possible witnesses. Supervalu also reviewed video footage of the incident. The evidence substantiated Kpou's allegation and Supervalu suspended Anderson for three and a half days.

Kpou continues to experience harassment. The seventeen discrete incidents, along with the ongoing harassment, have caused Kpou great anxiety. At one point, Kpou sought medical treatment for this anxiety.

**III.   Facts Related to Nyayolo's Complaint**

The record shows that Nyayolo encountered four incidents while working at the distribution center.

On January 23, 2017, Nyayolo used his seniority to bump white employee Scott Clifford off of a piece of equipment. The next day, Clifford struck Nyayolo's shoulder with the pallets on his forklift and began dragging Nyayolo **(Incident 1- "Clifford pallet incident")**. Clifford, who exhibited an attitude of entitlement and discrimination, was upset that Nyayolo, a Black man and African immigrant, had asserted seniority over him

the day before. Ultimately, Nyayolo had to yell for help because Clifford would not stop dragging him.

Supervalu immediately took Nyayolo's statement on what had happened, filled out an incident report, and brought Nyayolo to the hospital where he was treated for "a crushing injury to his shoulder." Def.'s Ex. WW, Nyayolo Dep. 109:17-110:7, ECF No. 72-4. Nyayolo was forced to take time off of work and worked "light duty" for six months when he returned to work. Nyayolo has yet to fully recover.

Supervalu interviewed Clifford the day of the incident. Clifford admitted to driving close to Nyayolo but said he did not hit Nyayolo. Clifford stated that he drove close to Nyayolo because Nyayolo had driven close to him. Supervalu also interviewed witnesses and reviewed video footage, though the location of the incident was not in direct view of a camera. Supervalu suspended Clifford and terminated him six days later. Clifford filed a grievance over his termination, but Supervalu upheld it and Clifford did not pursue arbitration.

Sometime in May 2018, African American employee Devon Sermons physically pushed Nyayolo off of a piece of equipment **(Incident 2- "Sermons incident")**. Sermons was upset that Nyayolo had been trying to bump him from the equipment using his seniority. Nyayolo testified that Sermons had pushed him because Sermons was born in the United States and there was a rivalry between African Americans and Black immigrants.

Supervalu interviewed both Sermons and Nyayolo. Sermons alleged that Nyayolo had physically tried to remove him from the machine and had called him the N-word.

Nyayolo admitted that he touched Sermons while trying to get on the machine but denied using the N-word or applying physical force. Supervalu determined that Nyayolo and Sermons had both engaged in misconduct. With the support of union leadership, Supervalu suspended them both. Nevertheless, Supervalu later dropped the suspensions.

Nyayolo experienced difficulty at work again when a co-worker named Nick made unpleasant comments towards him **(Incident 3- "Nick's comments")**. The Court will not go into detail regarding the incident because Plaintiffs do not discuss the incident nor argue it constituted harassment or retaliation.

Nyayolo also faced bullying from a supervisor named Pat **(Incident 4- "Pat incident")**. Nyayolo testified that Pat picked on him because of his race, color, and English proficiency. Nyayolo explained that Pat treated white employees better than non-white employees. After Nyayolo complained about Pat's behavior to another supervisor, Pat apologized to Nyayolo and Nyayolo had no further issues with him.

## IV.   Other Incidents

On September 4, 2015, a Black employee found and reported what appeared to be nooses blowing in a fan at the distribution center. Supervalu's representative testified that this was a violation of Supervalu's anti-discrimination policies but did not know whether Supervalu investigated the incident.

In another instance in 2015, Sturnieks replied, "Just another day at the zoo....." after learning that a white employee had cut out a picture of a monkey and told people it was Black employee Terry Jesme playing football. Pls.' Ex. 10, ECF No. 82 at 2.

There has been a general undercurrent of discrimination and retaliation during Walker's twenty-two years at the distribution center. Ray Bradford, a Black supervisor, has likewise admitted to racial tension at the distribution center. For example, Bradford brought a complaint against Hazen in August 2015 for wearing a "Black Guns Matter" shirt. Bradford explained that it was not the shirt, but the fact that Hazen called him over and taunted him about it, that bothered him. Bradford also reported Hazen for racist jokes in November 2016. Bradford reported Hazen a third time in February 2017 for threatening him. This ultimately led to Hazen's termination.

Hazen himself agreed there was hostility between Black and white employees at the distribution center. He testified that there were occurrences of violence and threats, but stated such occurrences were small.

Hazen also confirmed that employees who made complaints were generally retaliated against. Sturnieks understood as well that employees were concerned about retaliation for reporting complaints.

## LEGAL STANDARD

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a summary judgment motion, "[a]ll facts must be viewed in the light most favorable to the nonmoving party." *Gilkerson v. Neb. Colocation Ctrs., LLC*, 859 F.3d 1115, 1118 (8th Cir. 2017). To survive a defendant's motion for summary judgment, a plaintiff must present "sufficient probative evidence that would permit a finding in his

favor without resort to speculation, conjecture, or fantasy." *Reed v. City of St. Charles*, 561 F.3d 788, 790-91 (8th Cir. 2009) (internal quotations omitted).

## DISCUSSION

### I.   Harassment Claims

The same standard governs hostile work environment claims, also known as harassment claims, regardless of whether they are brought under § 1981, Title VII, or the MHRA. *Pye v. Nu Aire Inc.*, 641 F.3d 1011, 1015 n.3 (8th Cir. 2011); *Eliserio v. USW, Local 310*, 398 F.3d 1071, 1076, 1078 (8th Cir. 2005). Hostile work environment claims may include both discrimination and retaliation. *See Mahler v. First Dakota Title Ltd. P'ship*, 931 F.3d 799, 807 (8th Cir. 2019).

Where there is no direct evidence to support a discrimination or retaliation claim, courts apply the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Watson v. McDonough*, 996 F.3d 850, 854 (8th Cir. 2021). Under this framework, the plaintiff has the initial burden to establish a prima facie case of discrimination or retaliation. *Id.* If the plaintiff meets this burden, the burden shifts to the defendant to produce a legitimate reason for its decisions and actions. *Id.* If the defendant meets its burden, the burden shifts back to the plaintiff to prove the defendant's proffered reason was pretext. *Id.*

Here, Supervalu argues that neither Plaintiff can establish a prima facie case of discrimination or retaliation.

### a.  Discriminatory Harassment Claims

In Count 1, Kpou and Nyayolo both allege discriminatory harassment in violation of § 1981. In Counts 3 and 5, Nyayolo alleges discriminatory harassment in violation of Title VII and the MHRA, respectively. To establish a prima facie case of discriminatory harassment, a plaintiff must show: (1) membership in a protected class; (2) the occurrence of unwelcome harassment; (3) a causal nexus between the harassment and their protected class; and (4) that the harassment affected a term, condition, or privilege of employment. *Anderson v. Durham D&M, LLC*, 606 F.3d 513, 518 (8th Cir. 2010). Where a plaintiff's claim stems from coworker harassment, the plaintiff must show a fifth element, that the employer "knew or should have known about the harassment and failed to respond in a prompt and effective manner." *Id.*; *Carter v. Atrium Hosp.*, 997 F.3d 803, 811 (8th Cir. May 2021); *see also Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013) (holding that an employer is liable for a harassing coworker if the employer is negligent in controlling the working conditions).

### i.  Causal Nexus

Supervalu argues that many of the alleged instances of harassment lack the requisite causal nexus. To establish a causal nexus, a plaintiff must show that the harassment they encountered was connected to their protected status in "character or purpose." *Singletary v. Mo. Dep't of Corr.*, 423 F.3d 886, 893 (8th Cir. 2005) (quoting *Luckie v. Ameritech Corp.*, 389 F.3d 708, 713 (7th Cir. 2004)). Bare allegations that conduct was the result of a protected status are insufficient. *Palesch v. Mo. Comm'n on Hum. Rts.*, 233 F.3d 560, 567-68 (8th Cir. 2000).

However, there is no requirement that all instances of harassment be "stamped with signs of overt discrimination." *Diaz v. Swift-Eckrich, Inc.*, 318 F.3d 796, 800 (8th Cir. 2003) (quoting *Carter v. Chrysler Corp.*, 173 F.3d 693, 701 (8th Cir. 1999)). Facially non-discriminatory acts may satisfy the causal nexus requirement "if they are part of a course of conduct which is tied to evidence of discriminatory animus." *Id.* (quoting *Carter*, 173 F.3d at 701). In *Diaz*, the harassers' early comments concerning the plaintiff's national origin provided sufficient evidence on which a factfinder could find that the ongoing harassment was based on the plaintiff's national origin. *Id.; see also Bowen v. Mo. Dep't. of Soc. Servs.*, 311 F.3d 878, 884 (8th Cir. 2002) (finding that a harasser's use of two racial epithets permitted an inference that racial animus motivated all of the harasser's offensive conduct); *Green v. Franklin Nat'l Bank*, 459 F.3d 903, 911-12 (8th Cir. 2006) (finding a harasser's comments about wanting to eat the plaintiff's liver were race-based given the harasser's prior race-based comments).

### 1. Kpou

Supervalu argues that there is no evidence connecting Kpou's race or national origin to the incidents involving Walters, Bialucha, Dykhoff, Turner, the Anderson bump incident, or the Anderosn aisle blocking incident. The Court finds that a reasonable juror could conclude that these incidents were connected to Kpou's race or national origin.

There is evidence that the Walters threat was racially motivated. At the time, it was well known that Walters did not like "people of [Kpou's] color" and used "the 'N' word without any hesitation." Def.'s Ex. UU, Kpou Dep. 87:14-88:5, ECF No. 72-3.

There is likewise evidence that the incidents involving Bialucha and Anderson were motivated by Kpou's race and national origin. After the dispute in the breakroom, Bialucha told Kpou to get control of his Africans, even though Kpou had not been in the breakroom. Bialucha's discriminatory comment permits an inference that discriminatory animus motivated all of Bialucha's alleged harassment. *See Diaz*, 318 F.3d at 800; *Bowen*, 311 F.3d at 884; *Green*, 459 F.3d at 911-12. Similarly, a reasonable juror could conclude from Anderson's later comment "This is America, we pass on the right," that the bump incident and aisle blocking incident were motivated by Kpou's race or national origin. *See Diaz*, 318 F.3d at 800; *Bowen*, 311 F.3d at 884; *Green*, 459 F.3d at 911-12.

As Supervalu points out, there is evidence that many of the incidents involving Bialucha as well as the incidents involving Dykhoff and Turner were a result of Schmitz's termination. Schmitz's termination was itself a result of discriminatory animus. The breakroom dispute that occurred shortly before the Schmitz forklift incident arose between a group of white employees and a group of Black immigrant employees. After Bialucha engaged in a heated discussion with the group of Black immigrant employees, Schmitz threw a glass bottle towards them. Supervalu asserted that Schmitz's behavior was designed "to instigate or provoke violence between two distinct ethnic groups that were arguing." Def.'s Ex. O, ECF No. 72-2 at 36. Bialucha subsequently told Kpou to get control of his Africans; Bialucha and Schmitz angrily discussed their rights. Schmitz then ran his machine in Kpou's machine, yelling "I have rights too." Def.'s Ex. L, ECF No. 72-2 at 19. A reasonable juror could infer that retaliation for Schmitz's termination was part of the same discriminatory course of conduct Schmitz was terminated for.

24

Supervalu argues that one actor's racial motivation cannot be projected onto another actor's race-neutral conduct. However, race-neutral conduct can satisfy the causal nexus requirement if it is connected to an "obvious or overt racial incident." *See Smith v. Fairview Ridges Hosp.*, 625 F.3d 1076, 1085 (8th Cir. 2010), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011). In other words, "congruency of person *or* incident" is sufficient. *See id.* (emphasis added); *see also Green*, 459 F.3d at 912 (finding conduct was not racially motivated because there was "nothing in the record" to connect it to racial animus). Here, there is evidence in the record of a link between the discriminatory incident involving Schmitz and the incidents involving Bialucha, Dykhoff, and Turner. The latter stemmed from the former.

## 2. Nyayolo

Supervalu argues that the four incidents involving Nyayolo are devoid of any connection to Nyayolo's race or national origin. As mentioned above, the Court will not address the incident involving Nick because Plaintiffs themselves do not address it.

Supervalu claims that Nyayolo testified that the Clifford pallet incident had nothing to do with race and occurred only because Nyayolo had used his seniority to bump Clifford off of a machine. A review of Nyayolo's relevant deposition testimony reveals that Nyayolo was claiming that the incident took place not only because he had bumped Clifford from the machine, but because he, a "[B]lack guy working with him in the same place get[ting] paid the same amount of money," bumped him from the machine. *See* Def.'s Ex. WW, Nyayolo Dep. 58:21-60:18, ECF No. 72-4; *see also* Nyayolo Decl. ¶ 2, ECF No. 85. Nyayolo also testified that Clifford exhibited an attitude

25

of discriminatory entitlement. Given Nyayolo's firsthand account of the incident and Clifford's discriminatory attitude, a reasonable juror could conclude the incident was motivated at least in part by Nyayolo's race or national origin.

The same cannot be said for the Sermons incident. Nyayolo testified that Sermons pushed him because Sermons is an African American and Nyayolo is a Black immigrant. Though Nyayolo testified about a rivalry between African Americans and Black immigrants, Plaintiffs provide no evidence that Sermons was acting as a result of that rivalry or that Sermons had ever exhibited a rivalrous attitude.

As to the Pat incident, there is sufficient evidence on which a reasonable juror could find it resulted from Nyayolo's race. Nyayolo testified that Pat picked on him because of his race, color, and English proficiency. Nyayolo further explained that Pat never mistreated white people.

### ii. Harassment Affecting a Term, Condition, or Privilege of Employment

Supervalu next argues that the harassment Kpou faced did not constitute harassment affecting a term, condition, or privilege of employment. Generally, courts do not consider an employer's remedial actions when deciding if the harassment was sufficiently severe or pervasive. *Reedy v. Quebecor Printing Eagle, Inc.*, 333 F.3d 906, 908 (8th Cir. 2003). Harassment is deemed to affect a term, condition, or privilege of employment if it is (1) objectively hostile as perceived by a reasonable person and (2) subjectively severe or abusive as viewed by the plaintiff. *Anderson*, 606 F.3d at 518; *Ellis v. Houston*, 742 F.3d 307, 319 (8th Cir. 2014) (recognizing the element includes both

objective and subjective components). The standard is "demanding" and meant to "filter out those complaints concerning the ordinary tribulations of the workplace." *Anderson*, 606 F.3d at 519 (internal quotations omitted).

Here, Supervalu focuses on the objective component. When analyzing whether a plaintiff has satisfied the objective component, courts look to the evidence as a whole. *Ellis*, 742 F.3d at 319. Relevant factors include "the frequency and severity of the discriminatory conduct, whether it is physically threatening or humiliating or only an offensive utterance, whether it unreasonably interferes with the employee's work performance, physical proximity to the harasser, and the presence or absence of other people." *Id.* at 319-20 (quoting *Carter*, 173 F.3d at 702). Racial animus directed at other co-workers in the same protected group may also be "relevant in assessing the existence of a hostile work environment." *Watson v. CEVA Logistics U.S., Inc.*, 619 F.3d 936, 943 (8th Cir. 2010).

While "simple teasing, offhand comments, and isolated incidents" often do not satisfy the objective component, *id.* at 942, a barrage of continuous insults does, *see Diaz*, 318 F.3d at 800. "[A] work environment is shaped by the accumulation of abusive conduct, and the resulting harm cannot be measured by carving it into a series of discrete incidents." *Watson*, 619 F.3d at 943 (quoting *Carter*, 173 F.3d at 702). "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 69 (2006) (citation omitted).

Given the "constellation" of considerations, *id.*, "[w]hether conduct rises to the

level of harassment is usually a factual determination for the jury," *Fuller v. Fiber Glass*

*Sys., LP*, 618 F.3d 858, 864 (8th Cir. 2010) (citing *Moring v. Ark. Dep't of Corr.*, 243

F.3d 452, 456 (8th Cir. 2001)).

## 1. Kpou

Supervalu asserts that the Schmitz forklift incident, the first note, and the

Anderson shoving incident were not sufficiently severe or pervasive. One of the main

problems with Supervalu's argument is that its focus is too narrow. Supervalu assumed

that the Court would hold that no reasonable jury could find that the incidents involving

Walters, Bialucha, Dykhoff, and Turner, along with two of the incidents involving

Anderson, were on account of Kpou's race or national origin. As discussed above, a

reasonable juror could conclude that these incidents were connected to Kpou's race or

national origin. Furthermore, Supervalu does not account for the Ecker incident, the

second note,[9] Hazen's race comments, the Anderson forklift incident,[10] or the daily

insults and threats Kpou faced.[11]

---

[9]     Supervalu implies that the second note is irrelevant to Kpou because it was found
in Walker's locker. However, harassment experienced by another member of the
plaintiff's protected group may be relevant. *Watson*, 619 F.3d at 943. Moreover, Walker
found the note less than a month after acting as Kpou's union representative in the
investigation following the note found in Kpou's locker.

[10]    Though Kpou did not report the Anderson forklift incident, the Court need not
contemplate that at this stage in the analysis. *See Reedy*, 333 F.3d at 908.

[11]    Supervalu also ignores the Dennie incident, but Plaintiffs have presented no
evidence that the Dennie incident was connected to a protected status.

Considering the accumulation of these incidents over the last six years, the frequency of the harassment, the physical nature of the threats, and the physical proximity of Kpou's harassers could support a finding that the harassment was objectively hostile. *See also Fuller*, 618 F.3d at 864 (finding the level of harassment is typically a question for the finder of fact).

Kpou testified that he faced harassment every day. On December 31, 2015, Kpou also told Sturnieks that he faced daily comments and threats from coworkers. A reasonable juror could find such frequent harassment pervaded Kpou's work environment. *See Delph v. Dr. Pepper Bottling Co.*, 130 F.3d 349, 352, 356 (8th Cir. 1997) (upholding a hostile work environment claim where the plaintiff was subjected to a "steady barrage of racial name-calling"); *Bowen*, 311 F.3d at 885 (reversing summary judgment where the harassment was not frequent or infrequent as the jury could find it pervaded the plaintiff's work environment).

A reasonable juror could also find Kpou's harassment sufficiently severe, particularly in light of the physically threatening nature of many of the incidents. Supervalu employees operate machinery that weighs thousands of pounds. The Schmitz forklift incident, arguably the most severe incident Kpou encountered, placed Kpou in great physical danger. The Dykhoff incident, the Bialucha swerving incident, and the Anderson forklift incident likewise placed Kpou in physical danger. Walter threatened to punch Kpou and Anderson shoved him. The first note and second note not only used racial epithets but included death threats. The threats Kpou faced were particularly frightening given the fact that many workers carried weapons at work and in their cars.

29

The physical proximity of Kpou's harassers further supports Kpou's claims. In *Diaz*, the court of appeals reversed summary judgment in part because the harassers' demeaning comments were specifically directed at the plaintiff from a close range and other employees were sometimes present. 318 F.3d at 800. Here, Kpou worked in close proximity to his harassers each day for the entirety of his eight-hour shift. The record shows that the harassment often happened in front of other employees.

Supervalu's authorities do not persuade the Court that the harassment Kpou faced was insufficiently severe or pervasive as a matter of law. Supervalu relies on *Singletary* for the proposition that vandalism and racial slurs do not render a work environment hostile. Yet, in *Singletary*, the vandalism was not connected to the plaintiff's race and none of the racial comments were made to the plaintiff. 423 F.3d at 893. Furthermore, the incidents at issue here go beyond a "few occurrences [of racial epithets] over a course of years." *See id.* Kpou faced racial comments, but also death threats, threats with heavy machinery, and a barrage of insults.

Supervalu also relies on *Palesch*. There, the white plaintiff alleged she was ignored and isolated and that one co-worker damaged her car, shoved her, and threatened her. *Palesch*, 233 F.3d at 567. The court held that the plaintiff failed to provide any evidence connecting this conduct to her race or gender, particularly because the plaintiff admitted there were non-discriminatory explanations for the conduct. *Id.* Here, as discussed above, Plaintiffs have presented sufficient evidence connecting the harassment Kpou faced to his race and national origin.

The *Palesch* plaintiff further complained that her supervisors harassed her by putting her on paid leave and requiring her to take an independent psychiatric exam. *Id.* The court held that it was reasonable to put the plaintiff on paid leave until the extent of her medical condition could be determined and it was reasonable to require a psychiatric exam given the plaintiff's own conduct, including her statement about shooting someone at work. *Id.* These facts are unlike those at issue here.

*Watson v. Heartland Health Laboratories, Inc.*, 790 F.3d 856 (8th Cir. 2015) is distinguishable as well.[12] The plaintiff in *Watson* complained of eight instances of physical and nonphysical harassment within ten working days. 790 F.3d at 862. The court found the conduct did not show a hostile work environment because the plaintiff was at the workplace only a couple of hours each day and her contact with the harasser lasted mere seconds. *Id.* "Thus she was not subject to [the harasser's] conduct throughout her workday as in other Missouri and federal cases finding a hostile working environment existed." *Id.* Here, Kpou worked side by side his harassers each day for the entirety of his eight-hour shift.

### 2.  Nyayolo

The parties do not address the severity or pervasiveness of the harassment Nyayolo encountered. Nonetheless, on its face, the Pat incident is insufficient to support a hostile work environment claim. The Pat incident constitutes the exact sort of "isolated

---

[12]     As the *Watson* plaintiff alleged violations of the Missouri Human Rights Act, the Eighth Circuit was "guided by both Missouri law and federal employment discrimination caselaw that is consistent with Missouri law." 790 F.3d at 861 (citation omitted).

incident" that does not affect a term, condition, or privilege of employment. *See Watson*, 619 F.3d at 942 ("The standard is a demanding one, and simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not suffice." (internal quotations omitted)); *see also Mahler*, 931 F.3d at 807 (finding a single incident was not severe enough to alter the conditions of employment).

### iii.  Prompt and Effective Remedial Action

Supervalu further argues that Plaintiffs' discriminatory harassment claims fail because it took appropriate actions to address Plaintiffs' complaints. Where "the harassment was perpetrated by a nonsupervisory employee,[13] the plaintiff must also show the employer knew or should have known of the harassment and failed to take proper remedial action." *Carter*, 997 F.3d at 811 (cleaned up). Proper remedial action must be "prompt and effective." *Anderson*, 606 F.3d at 519 (quoting *Arraleh v. County of Ramsey*, 461 F.3d 967, 969 (8th Cir. 2006)). Courts consider various factors when assessing the adequacy of an employer's response. These factors include "the amount of time between notice of the harassment and any remedial action, the options available to the employer such as employee training sessions and disciplinary action taken against the harassers, and whether or not the measures ended the harassment." *Watson*, 619 F.3d at 945 (quoting *Jenkins v. Winter*, 540 F.3d 742, 749 (8th Cir. 2008)).

---

[13]     The parties do not address whether Pat is a supervisory employee as a matter of law. *See Vance*, 570 U.S. at 424, 428 (holding that an employee is a "supervisor" if he or she is "empowered by the employer to take tangible employment actions against the victim" and that "different rules apply where the harassing employee is the plaintiff's 'supervisor'"). The Court need not address the issue as the Pat incident does not rise to the level of actionable harassment.

As to the last factor, while an employer is not a guarantor of the success of its remedial action, its remedial action must be "reasonably calculated to end the harassment." *See Scusa v. Nestle U.S.A. Co.*, 181 F.3d 958, 967-68 (8th Cir. 1999). Reasonable calculation necessarily entails reasonable adjustments should new information arise. An employer who realizes its initial response was ineffective and fails to take further action has not reasonably calculated a response to end the harassment. If an employer receives information that the remedial action it took was ineffective, the employer should recalculate its response. After the plaintiff in *Diaz* informed HR of the ongoing harassment she faced, the defendant employer held an employee training session. 318 F.3d at 802. Nonetheless, a material fact existed as to the promptness and adequacy of the employer's remedial actions in part because the plaintiff testified that the harassment continued even after the training session. *Id.*; *see also Carter*, 173 F.3d at 703 (remanding the issue of the employer's response where the plaintiff alleged her coworker continued harassing her even after he had been reprimanded and suspended).

"The promptness and adequacy of an employer's response will often be a question of fact for the factfinder to resolve." *Carter*, 173 F.3d at 702. This is particularly true where an employer has a mixed record with regard to handling the harassment. *Reedy*, 333 F.3d at 910 (finding a genuine issue of material fact where the employer responded adequately to most, but not all, of the incidents it was aware of); *see Watson*, 619 F.3d at 944-45 ("Although the company did respond to some instances of harassment, including painting over bathroom graffiti, painting over the 'hang a n****r today' sign on the railcar, and firing Martin, a reasonable fact finder could conclude that supervisors at other

times acquiesced in discriminatory behavior or were at least indifferent to complaints."). Nevertheless, in some cases an employer's termination of the harasser may preclude liability for a hostile work environment claim as a matter of law. *See, e.g.*, *Green*, 459 F.3d at 912 (finding an employer promptly and effectively responded to the harassment by firing the harasser less than a month after learning of the harassment).

### 1. Kpou

Supervalu asserts summary judgment is proper in regard to Kpou's discriminatory harassment claims because it appropriately investigated and addressed "Kpou's three race-related complaints" and Kpou's "complaints that have no nexus to race/national origin." Def.'s Mem. Supp. Mot. Summ. J. 25-27, ECF No. 71.

Supervalu appropriately responded to many of Kpou's complaints, particularly because Supervalu's options were somewhat limited by the CBA. *See Watson*, 619 F.3d at 945 (finding courts should consider the options available to the employer). Nonetheless, Supervalu appeared indifferent to at least four incidents of harassment that Kpou faced. First, inferring the evidence in Plaintiffs' favor, Supervalu knew or should have known about Bialucha's post-breakroom comments. As Plaintiffs' counsel pointed out during oral argument, the police report related to the Schmitz forklift incident included information on Bialucha's post-breakroom comments. Yet, Supervalu took no remedial action.

Next, Supervalu was aware Kpou faced harassment from Dykhoff and Turner after Schmitz was fired because Kpou reported it. Though Supervalu asserts it "immediately looked into the Dykhoff and Turner allegations," Def.'s Mem. Supp. Mot. Summ. J. 27,

ECF No. 71, Supervalu has not pointed to any evidence in the record supporting this assertion.[14] Supervalu did offer to have someone escort Kpou to and from his car and to allow Kpou to store and eat his lunch in a manager's office, but there is no evidence Supervalu investigated the incidents or disciplined Dykhoff or Turner. Nor can it be said that Supervalu's offers were reasonably calculated to end Dykhoff's or Turner's harassment. These instances of harassment occurred while Kpou was on shift working, not while Kpou was travelling to or from his car or eating lunch. A factfinder may find Supervalu's response to the Dykhoff and Turner situations sufficient, yet it was not sufficient as a matter of law.

Finally, Supervalu failed to investigate the Walters threat for over a year despite the fact that Kpou reported it to a manager when it occurred. Supervalu asserts that the manager's failure to pass the information on to Sturnieks or someone else in HR was a mistake, but presents no evidence suggesting it was a mistake. A jury could reasonably infer that the manager's failure was inadvertent. Yet, a jury could also reasonably infer that the manager was indifferent to the harassment Kpou faced, particularly given the fact that the manager did nothing even after Walters refused to give a statement.

Supervalu is correct that punitive action is not always necessary "as long as a chosen remedy is reasonably calculated to prevent future harassment." *Takkunen v. Sappi Cloquet LLC*, Civ. No. 08-1454, 2009 WL 1287323, at *4 (D. Minn. May 6, 2009)

---

[14]     In its facts section, Supervalu states that it talked to Kpou and Ross about the Turner threats. However, Supervalu cites to the meeting notes from the meetings where Kpou first reported the harassment. *See* Def.'s Ex. CC, ECF No. 72-3; Def.'s Ex. DD, ECF No. 72-3.

(Supervalu's authority); *see also Meriwether v. Caraustar Packaging Co.*, 326 F.3d 990, 994 (8th Cir. 2003) (considering whether disciplinary or preventative measures were taken). Supervalu asserts it took preventative measures in response to Kpou's complaints: updating its security camera system and providing additional training. These responses were not reasonably calculated to end the harassment Kpou faced as a matter of law.

Supervalu updated its security camera system in October 2015. However, there is evidence in the record suggesting the update was not in response to Kpou's complaints and therefore could not have been reasonably calculated to end the harassment Kpou faced. As an initial matter, the update was a pilot program designed to determine the feasibility of similar updates across other distribution centers. It is also noteworthy that there were multiple, diverse reasons for the update. Though the reasons for the update included "increased safety of workforce from both accidents and misconduct," also identified were reasons such as "reduce material handling equipment replacement parts cost due to less equipment damage," "improved management of workers' compensation claims," and several food safety concerns stemming from recommendations by the United States Department of Agriculture and the Food and Drug Administration. Def.'s Ex. EE, ECF No. 72-3 at 21-24.

As to the 2016 management training and the 2016 Respectful Workplace employee training, a reasonable jury could find that the trainings were ineffective and that Supervalu needed to recalculate its response. *See Diaz*, 318 F.3d at 801-02 (finding that an employee training session, among other remedial measures, was not an adequate response as a matter of law). For instance, the warehouse manager who failed to pass on

information about the Walters threat did so after the 2016 management training. As to the Respectful Workplace training, though Hazen attended the Respectful Workplace training, he could not recall any anti-discrimination training. Hazen also testified that few employees took the training seriously. Some employees were asleep, and someone made gun sounds on their phone. Moreover, Kpou continued reporting harassment even after these trainings occurred. *See id.* at 802 (noting that the plaintiff testified that the harassment continued after the employee training session). Taking inferences in Plaintiffs' favor at the summary judgment stage, Supervalu should have been aware that its training was not an adequate preventative response.

Also noteworthy is Supervalu's failure to making any sort of statement condemning some of the more widely known incidents. A reasonable jury could find that Supervalu should have addressed the nooses found blowing in the fan, the racialized dispute in the breakroom, the Schmitz forklift incident, and the two racist death threats left in employees' lockers. These incidents occurred within a two-month period. Some sort of company-wide statement may have been appropriate given how many employees became aware of these incidents.

Given the mixed nature of Supervalu's record responding to the incidents at issue, whether Supervalu took proper remedial action is a question best left to the finder of fact. *See Carter*, 173 F.3d at 702; *Reedy*, 333 F.3d at 910; *Watson*, 619 F.3d at 944-45. Accordingly, the Court denies summary judgment with respect to Kpou's discriminatory harassment claim in Count 1.

### 2.  Nyayolo

Supervalu asserts summary judgment is proper as to Nyayolo's discriminatory

harassment claims because it appropriately responded to Nyayolo's complaints. The

Court analyzes only Supervalu's response to the Clifford pallet incident because

Plaintiffs did not address Nick's comments, there is insufficient evidence connecting the

Sermons incident to a protected status, and the isolated Pat incident is not actionable.

Supervalu took proper remedial action in regard to the Clifford pallet incident.

After learning of the incident, Supervalu immediately began investigating and terminated

Clifford six days later. *See Green*, 459 F.3d at 912. Summary judgment is proper on

Nyayolo's discriminatory harassment claims in Counts 1, 3, and 5.

### b.  Retaliatory Harassment Claims

In Count 2, Kpou and Nyayolo both allege retaliation under § 1981. To establish a

prima facie case of retaliation, a plaintiff must show that: (1) they engaged in protected

conduct; (2) they suffered a "materially adverse" employment action; and (3) the adverse

action was causally linked to the protected conduct. *Watson*, 996 F.3d at 856 (quoting

*Pye*, 641 F.3d at 1021). Retaliation claims may be "based on a hostile work environment

and need not be based solely on discrete adverse employment actions that affect the terms

or conditions of employment." *Stewart v. Indep. Sch. Dist. No. 196*, 481 F.3d 1034, 1042

(8th Cir. 2007) (citing *Burlington Northern*, 548 U.S. at 67). An action is "materially

adverse" in this type of claim if it "well might have dissuaded a reasonable worker from

making or supporting a charge of discrimination." *Id.* (quoting *Burlington Northern*, 549

U.S. at 68). Here, Plaintiffs claim they faced a materially adverse employment action when Supervalu allowed their coworkers' harassment to continue and escalate.

Supervalu argues that retaliatory harassment claims must stem from a supervisor's harassment. The Court disagrees. The question is not whether the harasser was a coworker or supervisor. Instead, the question is whether the employer's action or inaction would "have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.; Carpenter v. Con-Way Cent. Express, Inc.*, 481 F.3d 611, 618 (8th Cir. 2007).

In *Carpenter*, the plaintiff alleged retaliation in part based on the harassment of a coworker, Hardy. 481 F.3d at 618. As Supervalu points out, the district court in Carpenter held that "the Eighth Circuit has rejected the theory that continued harassment or hostility can constitute an adverse employment action." *Carpenter v. Con-Way Cent. Express, Inc.*, No. 4:05-cv-00393, 2006 WL 8437353, at *10 (S.D. Iowa May 31, 2006). Rather than follow the district court's reasoning, on appeal the Eighth Circuit asked "whether [the employer's] failure to stop Hardy's conduct and comments was an act which would have dissuaded a reasonable worker from participating in a Title VII investigation or action involving [the employer]." *Carpenter*, 481 F.3d at 618. The Eighth Circuit then found that the harassment was not so severe and pervasive as to create a hostile work environment. *Id.* Likewise, the court in *Clegg v. Arkansas Department of Correction*, denied the plaintiff's retaliatory harassment claim, which partially relied on coworker harassment, because the harassment would not have dissuaded a reasonable worker from engaging in the protected activity. 496 F.3d 922, 928-30 (8th Cir. 2007). Nowhere did the

*Clegg* court state or imply that a retaliatory harassment claim based on coworker actions was non-cognizable. *See id.*

The district court in *Carpenter* had supported its holding with *Manning v. Metropolitan Life Insurance Co., Inc.*, 127 F.3d 686, 692-93 (8th Cir. 1997). The problem with the *Carpenter* district court opinion, *Manning*, and many of the other cases Supervalu cites to is that they were all decided before the Supreme Court issued its 2006 ruling in *Burlington Northern*, 548 U.S. 53.[15] Before the Supreme Court's ruling in *Burlington Northern*, the Eighth Circuit had held that hostile work environments could not support retaliation claims. *E.g., Jensen v. Potter*, 435 F.3d 444, 448 (3d Cir. 2006) (describing the circuit split regarding whether a retaliation claim predicated upon a hostile work environment was cognizable). In *Burlington Northern*, the Supreme Court recognized that retaliation claims provided broader protections than discrimination claims. 548 U.S. at 66-67. The Court held that to establish the second element of a retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (internal quotations omitted). The Eighth Circuit subsequently recognized that retaliation claims could be based on hostile work environments. *Stewart*, 481 F.3d at 1042.

---

[15]     Though Supervalu's authority *Sandoval v. American Building Maintenance Industries*, 765 F. Supp. 2d 1138 (D. Minn. 2010) was issued after *Burlington Northern*, its primary authority, *Kipp v. Missouri Highway & Transportation Commission*, 280 F.3d 893 (8th Cir. 2002), was issued before *Burlington Northern*.

### i. Kpou

In its reply brief, Supervalu asserts that even if coworker retaliation is actionable, the retaliatory harassment Kpou faced was not sufficiently severe or pervasive. As discussed above, the frequency of the harassment Kpou faced, the physical nature of the threats Kpou received, and the physical proximity of Kpou's harassers allow a reasonable jury to find that the harassment rose to the requisite level.

Supervalu also cites Tenth Circuit case law for the proposition that supervisory or management level personnel must have "orchestrated, condoned, or encouraged the co-workers' actions." *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1265 (10th Cir. 1998). Even if such authority were binding, a reasonable jury could find that Supervalu's management condoned the harassment at issue here by letting it proceed unchecked. For example, Sturnieks herself testified that she understood Kpou felt that Supervalu was not supporting him. Sturnieks told Kpou that she could not stop his coworkers "from doing anything or from saying whatever they want to say to [him]." Def.'s Ex. UU, Kpou Dep. 201:12-202:15, ECF No. 72-3.

Because retaliatory coworker harassment, unchecked by an employer, is actionable and Supervalu's other two arguments fail, the Court denies summary judgment with respect to Kpou's retaliatory harassment claim in Count 2.

### ii. Nyayolo

Supervalu argues that Nyayolo's retaliatory harassment claim fails because Plaintiffs have not articulated a basis for it. The Court agrees. Plaintiffs have presented no evidence that Nyayolo suffered retaliation for complaining about the Clifford pallet

incident, the Sermons incident, Nick's comments, or the Pat incident. Summary judgment is granted on Nyayolo's retaliatory harassment claim in Count 2.

## II.   Negligence Claims

### a.  Negligent Retention

In Count 7, Plaintiffs claim that Supervalu negligently retained Hazen, Bialucha, and Anderson. Minnesota law recognizes the claim of negligent retention, which imposes "direct liability on an employer for an employee's intentional torts." *Soto v. Shealey*, 331 F. Supp. 3d 879, 884-85 (D. Minn. 2018). An intentional tort is an essential element of a negligent retention claim. *Id.*; *Yunker v. Honeywell, Inc.*, 496 N.W.2d 419, 422 (Minn. Ct. App. 1993).

Supervalu argues that Plaintiffs' negligent retention claims fail, in part, because the conduct at issue does not rise to the level of an intentional tort. Plaintiffs respond that "Supervalu negligently retained Hazen, Bialucha, [and] Anderson because each had been reported for harassment and threats of violence, but none were adequately disciplined." Pls.' Mem. Opp'n Mot. Summ. J. 55, ECF No. 78. Plaintiffs do not identify specific incidents and do not explain whether the incidents at issue constitute intentional torts. Nor do Plaintiffs identify anyone involved with Nyayolo's negligent retention claims. Because Plaintiffs have not demonstrated an essential element, summary judgment is granted in regard to Kpou's and Nyayolo's negligent retention claims in Count 7.

### b.  Negligent Supervision

In Count 8, Plaintiffs claims that Supervalu negligently supervised Schmitz, Hazen, Bialucha, Anderson, and Clifford. "Negligent supervision occurs when an

employer fails to 'exercise ordinary care to prevent the foreseeable misconduct of' its employee." *Soto*, 331 F. Supp. 3d at 887 (quoting *Raleigh v. Indep. Sc. Dist. No. 625*, 275 N.W.2d 572, 576 (Minn. 1978)). Supervalu argues that Plaintiffs' claims fail because none of the conduct at issue was foreseeable. Specifically, Supervalu asserts, "there is no evidence that any of the individuals implicated in this matter previously showed a propensity for violence." Def.'s Mem. Supp. Mot. Summ. J. 31, ECF No. 71. Plaintiffs need only show that "the employer knew or should have known that the employee was violent *or* aggressive and might engage in injurious conduct." *Udofot v. Seven Eights Liquor*, No. A10-431, 2010 WL 5071313, at *3 (Minn. Ct. App. Dec. 14, 2010) (emphasis added) (quoting *Johnson v. Peterson*, 734 N.W.2d 275, 277-78 (Minn. Ct. App. 2007)).

### i. Kpou

The Court addresses Kpou's claims as they relate to Schmitz, Hazen, Bialucha, and Anderson in turn. Supervalu could not have foreseen the Schmitz forklift incident. Though Plaintiffs argue that Supervalu's intervention after Schmitz threw the glass bottle would have prevented the Schmitz forklift incident, Plaintiffs present no evidence that Supervalu became aware, or even had time to become aware, of the glass bottle incident before the forklift incident. The forklift incident occurred a short time after the glass bottle incident and "no one immediately reported the [glass bottle] incident," Walker Decl. ¶ 6, ECF No. 84.

As to Hazen, Plaintiffs argue that Supervalu should have reprimanded Hazen after the first and second notes. Yet, Plaintiffs also admit that Supervalu "did not determine"

who wrote the notes. Pls.' Mem. Opp'n Mot. Summ. J. 9, ECF No. 78. Accordingly, Plaintiffs have not shown that Supervalu could have foreseen Hazen's subsequent misconduct.

Nor have Plaintiffs demonstrated that Supervalu could have foreseen Anderson's misconduct. Plaintiffs complain that Kpou reported Anderson on multiple occasions, but Supervalu took disciplinary action only upon the third reported incident, the Anderson shoving incident. Plaintiffs fail to account for Supervalu's responses to the first two reported incidents, the Anderson bump incident and the Anderson aisle blocking incident. After the former, HR sent Anderson a CDR reminder. After the latter, Supervalu investigated and finding Anderson and Kpou both at fault, issued them both CDR reminders. Given Supervalu's responses to the previous incidents, Plaintiffs have not shown that the Anderson shoving incident was foreseeable.

Accordingly, summary judgment is granted on Kpou's negligent supervision claims as they relate to Schmitz, Hazen, and Anderson.

Nevertheless, a reasonable jury could find that Supervalu knew or should have known that Bialucha was aggressive and may engage in injurious conduct. Bialucha's post-breakroom comments were in the police report related to the Schmitz forklift incident. Supervalu was also aware of Bialucha's tangential involvement in the Schmitz forklift incident. Because Supervalu's only argument fails as to Bialucha, summary judgment is denied on Kpou's negligent supervisions claims as they relate to Bialucha.

### ii. Nyayolo

Plaintiffs argue that the Clifford pallet incident was foreseeable because of the Schmitz forklift incident. The fact that Schmitz hit Kpou with heavy machinery in 2015 could not have made Supervalu aware that Clifford was violent or aggressive in 2017. Summary judgment is granted on Nyayolo's negligent supervision claims in Count 8.

### CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Supervalu, Inc.'s Motion for Summary Judgment [ECF No. 69] is GRANTED IN PART and DENIED IN PART.

   a. Summary Judgment is DENIED with respect to Plaintiff Meapeh Kpou's claims in Counts 1 and 2, and Count 8 as it relates to Employee Bialucha.

   b. Summary Judgment is GRANTED with respect to Plaintiff Meapeh Kpou's claims in Counts 5, 6, 7, and Count 8 as it relates to Employees Schmitz, Hazen, and Anderson.

   c. Summary Judgment is GRANTED with respect to Plaintiff Nyaquoi Nyayolo's claims in Counts 1, 2, 3, 4, 5, 6, 7, and 8.

2. Counts 5, 6, 7, and Count 8 as it relates to Employees Schmitz, Hazen, and Anderson are DISMISSED WITH PREJUDICE as to Plaintiff Meapeh Kpou.

3. The action is DISMISSED WITH PREJUDICE as to Plaintiff Nyaquoi Nyayolo.

Dated: August 24, 2021

s/ Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge